Friends and Analysts, good morning. We have four cases on the calendar this morning. A tax case from the Court of Federal Claims, two patent cases, one of them from the PTO and a veterans case. The veterans case and the PTO case will be submitted on the briefs and not be argued. Our first case is Louis Balestra et al. v. United States 14-5127, Mr. Monahan, Ms. Monahan. Thank you, Your Honor. May it please the Court. In enacting the statute of addition here, Congress departed from the general rule that FICA taxes imposed on wages at the time that they are actually received by the taxpayer. The effect of Section 3121b2 in a case such as this is that the taxpayer is taxed on a single amount as of his retirement date, reflecting future benefits that are expected to be received under the terms of a non-qualified deferred compensation plan. The question here is whether the regulation which mandates that this amount on which the taxpayer is going to be taxed must be computed with respect to, without regard to the near certainty. In this case, the taxpayer will not receive the benefit. In other words, you're saying that present value has to take into account the likelihood of a nonpayment. That's right. But that's not what the regulation says. That may make good economic sense, but that's not what the regulation says. That's absolutely not what the regulation says. The regulation directs that the taxpayer disregard present value, or disregard the amount will ever be received in computing present value. And what we're saying is that the generally accepted definition of the term value as used in the Internal Revenue Code means an economically feasible and realistic value. Well, that's not the term that's usually used. The usual term is fair market value, and Cartwright and these other cases are interpreting provisions that use fair market value. That language is not used in this provision, right? That's absolutely true. The Huntington case, and the taxpayer is interpreting the plain term of the statute value. So there are cases that interpret just the plain word value, and Huntington is an example of that, where if the value is computed under a regulation that uses a standardized method of computing value, it's so economically unreasonable as to essentially violate the meaning of the word value, and that the regulation is not applied. Well, are there any Court of Appeals cases that interpret statutes which use the term value rather than fair market value as requiring fair market value? It's true that the cases on which you realize McDonald and Gresham, which are Court of Appeals cases, use the term fair market value. Value is understood to represent... So that's the answer, there aren't any Court of Appeals cases that do that? There are tax court cases. But not Court of Appeals. Not Court of Appeals cases. I'm puzzled about the amount of money that's involved in this case. Not that that's determinative, but it's unusual. $3,800 and something dollars? That's right. And that's a product of the rate, in other words... I understand the mathematics, but I don't understand the litigation. Is there something more involved in this than the $3,000? Well, Your Honor, there's approximately 150 people in the Court of Federal Claims who have similar cases in similar or perhaps greater amounts. There's an erroneous refund case that's now pending in district court in Florida where the erroneous refund is maybe in the $20,000 range. So you see this as a lead case of some kind? Yeah, the Court of Federal Claims stayed the other cases with the other pilots until this case could be finally resolved. So in the aggregate, it is probably a fair amount of money. Well, with the individual cases, would the amount of around $4,000 be typical of the amount that's claimed? I can't really say, Your Honor. Certainly the guy in Florida has some $26,000 at issue. So, you know, certainly I would doubt that anybody has a million dollars at issue. I would think not. Right. Or even $100,000, because we're talking about a 1.45% rate, and most of these people did receive something, right? That's the reason that they got taxed in the first place is because they were paid something by United. People who retired after United stopped paying which was actually before the final decision which terminated the plan, those people presumably did not pay any FICA tax on the value of these benefits, even though at the time they retired they were theoretically legally entitled to. I thought the judge below, perhaps not below, the judge of the Court of Federal Claims had written a quite persuasive opinion, carefully worked through, carefully thought, cited all the relevant cases and regulations. Can you point to specifically something that judge did wrong? Because we correct errors, we don't retry cases. So what exactly, in the judge's opinion, went wrong? The judge's opinion doesn't discuss the Supreme Court's decision in Cartwright, which interprets the term fair market value, and it doesn't discuss any of the Court of Appeals decisions also interpreting the term fair market value, or the tax court decisions interpreting the term value, and refusing to apply regulations adopting a standardized method of value where the value produced by the regulations is so economically unutilized to be something other than the value. The judge also here relies pretty solely on administrability. In other words, the justification for the regulation here is that it is administrable. Of course, that would cover, for example, if the Treasury were to adopt a regulation setting forth a flat amount per person. That would be very administrable. In other words, if you're covered by a non-qualified deferred compensation plan, you'll be taxed on $1 million per person at the time of your retirement. And that would be a very administrable regulation. Certainly, there's nothing in the words amount deferred that would suggest that that's prohibited. And the Treasury did not make any other justification as to why the amount deferred should be calculated without regard to whether the taxpayer would ever receive the money. Did you agree that it could be pretty complicated to determine fair market value of these deferred compensation plans? There's a standardized method for determining the value of any present value of, for example, an annuity or any other stream of payments made over time. This stream of payments was intended to be made over someone's life. So, there are mortality tables. Well, sure. That's not complicated, right? That's taken into account in the regulation. What's not taken into account is the credit worthiness. There's no standard method for determining the credit worthiness of the employer, right? What do regulations do? The answer is yes or no. Well, there is actually, right? There are credit ratings that employers have, right? There's certainly standardized methods for determining whether somebody is likely or not likely to pay back one of their unsecured debts. But that can be a pretty complicated exercise, right? Would it be complicated? Well, certainly in the cases where you can, the taxpayer can show, and I'm not suggesting that the rule should be every employer has to determine their own credit worthiness, and that's the only reasonable interpretation that the Treasury could have adopted. Well, every day bonds trade on an exchange based in part on, maybe small part, but in part on likelihood of repayment. So, it is calculable. Well, yes, it absolutely is calculable. But there's no market that there is for bonds that would allow you to determine the value of the deferred compensation, right? Well, bonds, for example, are typically, well, maybe unsecured or secured, right? United here... But the answer is there's no market. There's no market for deferred compensation promises. Right. Typically, they're not transferable, right? So, you can't sell them or buy them. However, there is, you know, how could United have borrowed unsecured? And the answer is they could not have borrowed unsecured at any rate at the time Mr. Molester retired. Well, the risk that they don't want to take into account is the risk of bankruptcy, isn't it? That's correct. They don't want to take into account, well, in this case, United was bankrupt at the time. It's not that United might go bankrupt in the future. What we're saying is United was bankrupt. Well, we're going to take that up with the other side, but at least I am. But the issue in this regulation, as I understand it, is should we have a regulation, is it unreasonable to exclude from the regulation the risk of bankruptcy of a company that is going to at some time in the future pay a deferred retirement, right? Isn't that... Right. Isn't it unreasonable to take into account that the company is bankrupt and seeking to terminate the plan? Yeah, because I've read your briefs. You're not saying that the creditworthiness has to be taken into account in every instance, only when the company is actually bankrupt. Is that correct? Right. The case law says essentially it's a safety valve. And if the taxpayer can show that the value is unreasonable in this case, and significantly unreasonable as compared to the value that... Am I correct that you're attempting to distinguish between companies that are in bankruptcy and those that might in the future become bankrupt? And you're saying that the regulation only needs to take account of actually bankrupt companies. Is that correct? That's correct. And that's what we have here. Okay, but how do you possibly distinguish between companies that are actually bankrupt and companies that might become bankrupt? In other words, you're saying they have to take into account the creditworthiness in one situation, but not in others. Why is that reasonable? Under the Bankruptcy Code, of course, companies can avoid their contracts. And here, there's a collective bargaining... No, no, but you're not answering my question. From the point of view of the tax law, you're asking us to distinguish between companies that are actually bankrupt and those that might become bankrupt. In the actual bankruptcy case, you say that you have to take into account creditworthiness, but you say that in the future bankruptcy possibility situation, you don't have to take into account creditworthiness. From a tax standpoint, how can we specify a distinction between those two situations? That's a bright line, Your Honor. It's like one company is entitled to avoid a contract when the other company is not. If the standard were fair market value, you'd have to take into account the risk of each one of those situations, not draw that bright line that you're talking about, right? Well, no. The Treasury can take into account administrability. And certainly, there are standard methods of determining things. And what the case law says is where those standard methods go wrong, we have to apply a different value. Well, it sounds to me as though you're asking us to do the job that the Treasury has of rewriting the regulation to allow creditworthiness to be taken into account for bankrupt companies, but not those that might in the future become bankrupt. And it's hard for me to see that that's our job. Well, I don't think the courts of McDonald and Gresham thought that they were rewriting the regulation. What they were saying is the understanding of the term, in that case fair market value, prohibits a regulation which doesn't consider an important component of fair market value. Yeah, but they weren't distinguishing between bankruptcy and present bankruptcy and future bankruptcy. No, they were talking about restrictions on transfer, which is a totally slippery subject. How much does that create a discount in the value of stock? That's something that has to be individually determined. I see my time is up. We will save you rebuttal time. Thank you. Mr. Cohen. Mr. Cohen, let's pick up where Ms. Monaghan left us, which is the regulation specifies certain kinds of things to take into account, but doesn't include this bankruptcy problem. Is that correct? That's correct. Well, death is certain, and you can calculate risk there based on large populations without any problem. Life insurance companies, everybody does that without any difficulty. I can see the problem with trying to calculate the risk of bankruptcy causing someone not to be able to get their deferred compensation when they haven't gone bankrupt yet. But once a company goes bankrupt and we know exactly what the facts are, why isn't that easily calculated? I can answer that in two ways. It takes three pages in our brief, from pages four through seven, to chart the history of United's bankruptcy from 2002 until they finally wound the plan up in 2006 or 2007. So filing the petition and being in bankruptcy was not a determinative event so far as actually paying out these benefits from the non-qualified plan. Let me put it to you this way. But it was by the time, when was it finally known, 2002 to when? 2007, I think, is the final, that was after the Seventh Circuit decided in 2006. There was no later than 2007, right? Certainly no later than that, probably 2006. And this litigation didn't occur until... He filed a refund claim in May of 2007. How about if he'd filed it in 2010? Would that have made a difference? No. But we knew all the facts. But by that time, of course, there wouldn't be any benefits at all. Everything was... It was agreed that there would never be any further benefits. The last payment that he got, I believe, was in 2007, and it was some $74, some stock. His retirement was in 2004, which was when, actually, the termination happened. In 2004, the status of the bankruptcy and the payouts that were going to be made was far from clear. Exactly. They had asked for a loan from the Stabilization and the Safety Board. The CBTC was raising a rumpus. They were in the middle of protracted litigation involving the unions and how they were going to pay their qualified plan people, and that was going to influence what happened with the non-qualified plan. Let me make one point on the contingencies. If a fellow retires, and he's, let's say, 60 years old and in good health and under the regulations, it's posited that in his non-qualified, non-account balance plan, the value as computed under the regulation, which looks only to his actuarial mortality and to interest rates, is that his plan payment is $1,000, on which he owes FICA tax, Social Security, and health insurance tax. And the next day, or let's make it the next month, he collects one payment, or maybe he doesn't collect anything, he steps off the curb and he gets hit by a truck. Now, he has had to pay FICA tax on a chunk of money that he is never going to see. That puts him in the same boat, no, a very different boat, than the guy who gets a $1,000 balance, but instead of dying as the mortality tables say he should do in 10 years, he lives for 20. He's gotten a free ride, because he doesn't pay any FICA tax on the value of that extra 10 years. This is, indeed, a rule of administrability. It does not, as you point out, it does not turn on fair market value, because, as Ms. Monahan said, there's no market for deferred comp benefits. You don't look to things like Cartwright and cases like that that talk about restrictions on the transfer of property, or whether you have to use some value that is open to question, because there's no market for it. This is a tax that's imposed on money that has been earned, it hasn't been paid, it's been earned, and it has to pay its share of Social Security and health insurance taxes. It isn't to the point that, irrespective of economics, there's a regulation, and there's little basis for us to invalidate the regulation. I would submit, Your Honor, there's no basis for you to invalidate the regulation in terms of any Chevron criteria, in terms of any state farm issues. The regulation, it seems to Judge Walsky, and it certainly seems to us to be a very reasonable regulation. This is not a Dominion Resources type of problem. You don't have to get your hands dirty with that one. I think if the Court has no further questions, I'm through. Ms. Monahan has a little time for rebuttal. Ms. Monahan, Judge Lurie put his finger on our problem, even if it's not yours, which is that regulation. We have to find that regulation invalid in order to help you, don't we? That's correct, Your Honor, and unlike the government, we think that Dominion helps us, in that the regulation is illogical in ways that the regulation was in Dominion, in that it takes the concept of value and says, forget whether you will actually ever be paid. You're valuing a future payment stream, and we tell you in valuing that, forget whether you're going to actually get it or not. And not because you might be hit by a truck or because you might outlive the actuarial tables. We have to value things that are future payment streams that are life contingent using mortality tables. That's how we do it. And there's winners and losers in individual taxpayers, but the large number says the government is whole, and taxpayers as a whole are going to die according to those mortality tables. So it's not about the mortality table, getting hit by a truck, living a long time. You have to value something, a future stream based on mortality. But more importantly, you have to look to whether you are going to actually get that money. And that's what we say is the illogical assumption that the regulations are making. Similar to the illogical assumption that the regulations made in Dominion, that if you took a boiler out service, you have to approve interest on the entire claim. And where there is an illogical assumption like this in the regulations, this is something that the issuing agencies should have their claim. Where it conflicts with a long-standing principle of tax, where it conflicts with the premise that Social Security taxes impose on income, the agency should have to explain why it is disregarded what would be normally considered to be a very important component of figuring out the value of a future payment stream. Thank you, Ms. Monaghan. Ms. Monaghan will take the case on revisement.